UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHARON BABARINSA,

                    Plaintiff,

        v.                                                    **DECISION AND ORDER**
                                                              11-CV-1063S

KALEIDA HEALTH, BUFFALO GENERAL HOSPITAL,

                    Defendant.

## I.   INTRODUCTION

        Plaintiff Sharon Babarinsa commenced this action against her employer on December 15, 2011. In an Amended Complaint filed March 1, 2012, Babarinsa alleges she was discriminated against based on her race and retaliated against for filing a complaint of discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("HRL"). The violations are alleged to have occurred from April 2009 to early 2011.

        Presently before this Court is Defendant's Motion for Summary Judgment. The motion is fully briefed and the Court has concluded there is no need for oral argument. For the reasons stated below Defendant's motion will be granted and Plaintiff's claims dismissed in their entirety.

1

## II. BACKGROUND

### A. Facts

The undisputed facts of this case are as follows.

Kaleida Health operates a number of healthcare facilities in Western New York including Buffalo General Medical Center, formerly known as Buffalo General Hospital.[1] Plaintiff, an African American, commenced employment at Buffalo General in 1982, and her current position is Registered Nurse ("RN") on 15 South. In that position, Plaintiff is responsible for assessing and identifying patient needs, developing and implementing patient care plans in coordination with other medical professionals, administering routine tests and medications as prescribed by treating physicians, and coordinating care with family members and others as authorized by the patients. The RN position is covered by a collective bargaining agreement between Kaleida Health and Nurses United CWA (the CBA).

For each shift, Defendant assigns a RN as charge nurse, responsible for the overall operation and flow of the unit during that shift. Among other things, the charge nurse presides over multidisciplinary rounds and provides up to date information on each patient on the unit to various care providers. The charge nurse also updates patient charts to ensure adherence to physician orders, makes patient assignments to the RNs and other staff on the shift, and must communicate patient information to appropriate staff, including the oncoming shift. The nurse in charge is not required to take patient assignments. To be qualified for charge nurse duty, a RN must complete charge nurse training and demonstrate the required competencies. The CBA provides that:

---

1 Kaleida Health and its Buffalo General facility are referred to hereafter as "Defendant."

> The charge nurse assignment will be rotated evenly among all qualified/competent and trained nurses. Continuity of patient care and consistency of assigning consecutive days of charge will be taken into account.

Docket No. 27-8 at 9.

Plaintiff was and is qualified to perform charge duties and has periodically served in that role. Plaintiff also periodically served as preceptor to new RNs assigned to her unit. Unit managers typically prepare the work schedule, including duty assignments, on a monthly basis for the following month. Charge nurses earned an additional $1.50 per hour prior to June 2009, and an additional $2.00 per hour thereafter. Nurses serving as preceptors during the relevant time period earned an additional $2.50 per hour.

During the relevant time period—i.e. April 2009 to early 2011—Plaintiff reported to Nurse Manager Karen Carlson, except for a period from early September 2010 to mid-January 2011, when Stella Koginos was Nurse Manager on the unit. Managers, including nurse managers, typically are responsible for addressing violations of Defendant's policies by the employees they supervise. Defendant's expectations for employee conduct are set forth in a Standards of Personal Conduct Policy. Depending on the severity of the conduct, corrective actions may include verbal counseling and re-education, written warnings, or termination. When a manager contemplates corrective action above the level of a verbal warning, he or she must first consult with the Human Resources Department to ensure the discipline is commensurate with the severity of the misconduct and consistent with corrective actions applied to other employees who engaged in similar violations. Ms. Carlson monitored Ms. Koginos during her brief tenure as Nurse Manager, but did not review her disciplinary recommendations or become

involved in her disciplinary decisions.

While Plaintiff was serving as charge nurse, on June 21, 2009, she was involved in a verbal altercation with Flora Pattacciato, a RN working on the unit, regarding the patient assignments Plaintiff had made. The altercation was heard by staff and patients, and Defendant considered the incident disruptive and unacceptable. Rashaun Tubbins, an African American member of Defendant's Human Resources staff, investigated the matter. After interviewing and reviewing written statements from the participants and witnesses, Mr. Tubbins consulted with Ms. Carlson. They concluded that Plaintiff and Ms. Pattacciato had violated Defendant's Standards of Personal Conduct Policy and expectations for acceptable behavior, and agreed that both employees would be administered verbal warnings and required to attend a conflict resolution class. In addition, Plaintiff was removed from charge assignments until she completed the conflict resolution class and an additional non-defensive communication class. She was not removed from preceptor assignments. Ms. Pattacciato, who was not eligible to perform charge duty, was not required to attend the non-defensive communication class. The warnings were given on June 25, 2009, and Plaintiff filed a union grievance the same day. Verbal warnings remain in an employee's file for six months, after which they are removed and may not be used as a basis for further progressive discipline.

During the period the verbal warning remained in Plaintiff's file, Ms. Carlson received complaints from two RNs regarding Plaintiff. First, a new RN that Plaintiff was precepting complained that Plaintiff was not an effective team leader, often spoke down to her, and made her feel uncomfortable. In a written complaint, another RN stated that Plaintiff yelled at and argued with nurse aides, and complained about other staff members

4

in the presence of patients and their family members. This conduct could have provided a basis for progressive discipline. Instead, Ms. Carson addressed the concerns with Plaintiff informally, where she emphasized the importance of teamwork, avoiding disruptive conflicts, and providing constructive feedback in an appropriate setting. Plaintiff denied that she had engaged in unacceptable conduct.

On or about October 1, 2009, Ms. Carlson found three small bags of marijuana in a conference room on the unit. She asked the staff members who were in the conference room at the time if the bags were theirs or if they knew to whom they belonged. While Ms. Carlson was making those inquiries, Plaintiff entered the conference room and she, too, was asked if the bags belonged to her. Plaintiff denied they did, and she concedes that was the last she heard on the matter.

Defendant received further complaints about Plaintiff on January 29, February 1, and February 6, 2010. Mr. Tubbins and Ms. Carlson conferred and concluded that Plaintiff had violated Defendant's standards in each instance by, respectively: (1) failing to provide prescribed pain medication to two patients despite their requests; (2) loudly sharing private information about a patient at the front desk and also with the patient's roommate; and (3) pressing another employee to provide her a statement about an incident that had occurred seven months prior and did not involve Plaintiff. They issued a written warning to Plaintiff on February 16, 2010 and required her to review and sign off on Defendant's Confidentiality, Standards of Personal Conduct, and Non-Harassment policies. Written warnings remain in an employee's file for twelve months.

Defendant assesses employee performance on an annual basis, usually around their employment anniversary date. Managers are responsible for assessing the

employees they supervise in four core areas—quality of work, service excellence, teamwork/communication, and accountability/commitment. An employee's performance of essential job functions is rated as either meeting expectations or in need of improvement. Human Resources does not participate in drafting employee assessments, but does review them for fairness and consistency. Employees can review and comment on their assessments, and are encouraged to address concerns with their managers. If an employee disagrees with the manager's performance assessment, he or she can take the matter to Human Resources for review.

On February 26, 2010, less than two weeks after Plaintiff was issued the written warning, Ms. Carlson administered Plaintiff's 2009 annual assessment. Overall, she rated Plaintiff as meeting all competencies, but assessed her as needing improvement in the areas of service excellence and teamwork/communications. Ms. Carlson elaborated:

> Sharon is competent to perform her RN competency and job description. Needs improvement on building team relationships. Needs to improve on the effectiveness of communication and interaction with peers and others.

(Docket No. 27-10.) Plaintiff noted that she did "not agree with negative comments." (Id.)

On November 21, 2010, while Plaintiff was charge nurse, two sets of medication orders were not transcribed. As previously noted, charge nurses are responsible for reviewing and updating patient charts to ensure that physician orders are properly entered and adhered to. Ms. Koginos, who was then the unit's Nurse Manager, verbally counseled Plaintiff, on November 23, 2010, regarding Defendant's expectation that orders be transcribed in a timely fashion. That same day, Ms. Koginos received an email from Dr. Sanford Levy stating that Plaintiff, who was assigned to charge duty on that day as well, was not prepared for interdisciplinary rounds and could not answer questions

relating to patient care and status. Ms. Koginos removed Plaintiff from charge assignment for a period of approximately two months, until she left the Nurse Manager position in or about mid-January 2011.

Ms. Carlson, who had supervised Plaintiff for approximately eight months during the relevant period, administered Plaintiff's 2010 annual review on February 11, 2011. She assessed Plaintiff as "meets requirements" on all measures, noting that "Sharon has improved communication skills while in charge." (Docket No. 27-11.) Plaintiff signed the review without comment.

Plaintiff concedes that Defendant maintains workplace policies expressly prohibiting discrimination, harassment, and retaliation; that the policies are distributed to employees and otherwise made available to them, are incorporated into collective bargaining agreements, and include procedures for reporting prohibited conduct; that Defendant's Human Resources Department promptly investigates internal complaints of discrimination or harassment, and, if it is determined that the non-discrimination policies have been violated, Defendant takes prompt corrective action.

Human Resources personnel—including Mr. Tubbins and former HR Manager Brian Anderson, who also is African American—reviewed Plaintiff's grievances and complaints. On April 16, 2009, Plaintiff filed a union grievance alleging that charge nurse assignments on her unit were not equally distributed between all interested RNs. Mr. Tubbins met with Plaintiff, who then complained that Caucasian RNs received more charge assignments than she did. After investigating the matter, Mr. Tubbins found no evidence to suggest that Caucasians on the unit received more charge assignments than African Americans.

On June 25, 2009, Plaintiff filed a grievance alleging that the verbal warning she had received that day was unjust and requesting it be removed from her file. She did not claim in the grievance that the warning was issued because of her race or was retaliatory. Although the warning was due to remain in her file until December 25, 2009, Ms. Carlson agreed to its removal effective November 23, 2009, after Plaintiff completed the required classes and Ms. Carlson had the opportunity to observe whether her communication skills had improved. Ms. Pattacciato's warning remained on file for the full six month period.

Plaintiff filed a charge of discrimination with the United States Equal Opportunity Commission ("EEOC") on December 8, 2009. There, she alleged that Defendant discriminated against her by giving non-Black employees more frequent charge nurse assignments and that, after she filed her April 16, 2009 grievance on the matter, Defendant retaliated against her by subjecting her to unwarranted discipline, false accusations, harassment, and removing her from charge nurse duty.

On March 8, 2010, Plaintiff filed a grievance alleging that the written warning she received on February 16, 2010 was unjust and requesting it be removed from her file. She did not claim in the grievance that the warning was issued because of her race or was retaliatory. On June 14, 2010, Human Resources proposed to resolve the grievance by removing the written warning from Plaintiff's file on August 16, 2010, after six months rather than twelve, as long as there were no additional patient complaints or failures to medicate in a timely fashion prior to that date.

The EEOC issued a Dismissal and Notice of Rights, dated October 4, 2011, stating it was unable to conclude that Defendant had engaged in unlawful conduct. Plaintiff timely

commenced this action on December 15, 2011. Her Amended Complaint alleges that Nurse Manager Carlson favored Caucasian employees over African Americans for charge nurse assignments, falsely accused Plaintiff of possessing marijuana in the workplace, and subjected her to undeserved discipline. Plaintiff further alleges that, after she filed her EEOC charge, Ms. Carlson placed a written warning based on fabrications in her personnel file, she was removed from charge nurse duties for two months beginning in November 2010, and Ms. Carlson entered a false statement on her performance evaluation in February 2011.

## III. DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." Id. The moving party bears the burden of demonstrating that there is no genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), and the court must draw "all reasonable factual inferences in the light most favorable" to the non-moving party, DeFabio v. East Hampton Union Free School Dist., 623 F.3d 71, 74 (2d Cir. 2010).

While "courts should not 'treat discrimination differently from other ultimate

questions of fact,'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S.

Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

524, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)), they should exercise caution in deciding

to grant summary judgment in a case where the employer's intent is at issue, see

Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). In a case involving allegations

of discrimination, "affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination." Holcomb, 521 F.3d at

137 (citation and quotation marks omitted).

### B.  Timeliness of Title VII Claims

Defendant first urges that any discriminatory conduct alleged to have occurred

prior to February 11, 2009 is time-barred. The Amended Complaint contains only one

such allegation, regarding a charge nurse assignment Ms. Carlson made in 2006.

(Docket No. 1 ¶ 14.)

It is well-established that, in a state like New York, with its own fair employment

agency, "an employment discrimination claim must be filed with the EEOC within 300

days of the alleged discrimination." Pikulin v. City Univ. of New York, 176 F.3d 598, 599

(2d Cir.1999). "[W]hen a plaintiff fails to file a timely charge with the EEOC, the claim is

time barred." Butts v. City of New York Dep't of Hous. Preservation & Dev., 990 F.2d

1397, 1401 (2d Cir.1993), superseded by statute on other grounds, Civ. Rights Act of

1991, Pub. L. No. 102-166, 105 Stat. 1071. Plaintiff filed her administrative charge on

December 8, 2009, and an alleged act of discrimination occurring in 2006 is clearly

outside the 300-day period.

While there are some exceptions to this 300-day statutory bar, Plaintiff does not

argue that any exception applies. Indeed, she implicitly concedes the untimeliness of the 2006 allegation as a basis for a discrimination claim when she notes that the event may constitute relevant background evidence supporting her timely allegations. (Docket No. 34 at 13.) Thus, to the extent Defendant seeks summary judgment on timeliness grounds with respect to alleged conduct occurring in 2006, the motion will be granted.

### C. Title VII Discrimination Claims

Where, as here, a plaintiff does not come forward with direct or overt evidence of discrimination, the Court applies the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Under this standard, the plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. The plaintiff bears the initial burden of showing, by a preponderance of the evidence: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the circumstances of the adverse action give rise to an inference of discrimination. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). The plaintiff's burden at the prima facie stage of summary judgment is minimal.  Fisher v. Vassar College, 114 F.3d 1332, 1340 n.7 (2d Cir. 1997) (en banc), cert. denied, 522 U.S. 1075, 118 S. Ct. 851, 139 L. Ed. 2d 752 (1998).

If a plaintiff meets this initial burden, a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. Burdine, 450 U.S. at 254. If the defendant succeeds in making its showing, "the presumption . . . arising with the establishment of the *prima facie* case drops from the picture." Weinstock v. Columbia

11

Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citations omitted).

The burden then shifts back to the plaintiff to produce "evidence that the defendant's proffered, nondiscriminatory reason is a mere pretext for actual discrimination." Id. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Id. However, "evidence contradicting the employer's given reason—without more—does not necessarily give logical support to an inference of discrimination." James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). Put simply, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Id. at 156 (quoting St. Mary's, 509 U.S. at 519).

Defendant concedes, for purposes of its motion, that Plaintiff satisfies the first and second prongs of her prima facie burden, but argues that she cannot show she was subjected to any adverse employment action. Defendant has made no argument regarding the fourth prong and it therefore is presumed, for purposes of this motion, that Defendant concedes Plaintiff has satisfied this element, as well.[2]

1.  The Prima Facie Case

For claims of discrimination, an adverse employment action is described as "a materially adverse change in the terms and conditions of employment." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citation and internal quotation marks omitted).

To be materially adverse, a change in working conditions must be more

---

[2] An inference of discriminatory intent may be based upon evidence that other, similarly-situated employees who were not members of the plaintiff's protected class were treated more favorably than the plaintiff. See Liebowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir.2009).

> disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

Id. (citation, internal quotation marks, and ellipsis omitted).

### a. The Distribution of Charge Hours

Plaintiff's claim of discrimination is based, in part, on her allegation that she received fewer charge assignments than two Caucasian RNs during the period from December 2008 to April 2009, when she filed a grievance on the matter. She offers sworn testimony and evidence relative to the alleged disparity.

While Defendant urges that Plaintiff is attempting to create discrimination where none exists by focusing on a brief, discrete time period within her lengthy tenure, Defendant concedes that Ms. Carlson "realigned" charge shift assignments after Plaintiff's April 2009 grievance and that the two Caucasian employees with whom Plaintiff compared herself realized the greatest decrease in charge assignments.[3] Defendant does not contend that a reduced opportunity to earn additional income is insufficient to constitute an adverse employment action. Thus, Plaintiff has met her minimal burden at this prima facie stage.

### b. Employee Discipline and Evaluations

In 2009, Plaintiff received a verbal warning after she was involved in a verbal altercation with another employee, and her annual evaluation for 2009 noted the need for improvement in building relationships and communicating effectively. "The application of the [employer's] disciplinary policies to [the employee], without more, does not constitute

---

3 Plaintiff's charge assignments also decreased, but to a lesser degree.

adverse employment action." <u>Joseph v. Leavitt</u>, 465 F.3d 87, 91 (2d Cir. 2006). It has been noted routinely that negative performance evaluations, formal reprimands, and counseling memoranda are not adverse employment actions for purposes of a disparate treatment claim unless accompanied by negative repercussions such as reduction in pay or an injury to a plaintiff's ability to secure future employment. <u>Gaidasz v. Genesee Valley Bd. of Co-op. Educ. Sys. (Boces)</u>, 791 F. Supp. 2d 332, 337 (W.D.N.Y. 2011).

Plaintiff maintains it is not the verbal warning alone that altered the terms of her employment, but the five month removal from charge duty that accompanied the verbal warning. She has offered evidence to support her assertion that she is the only RN to have been removed from charge eligibility. As a result, she lost the opportunity to earn a $2.00 per hour premium for the charge shifts she otherwise would have received in that five month period.

Defendant urges that Plaintiff's removal from charge duties was never documented in her personnel file (see Docket No. 27-12) and, so, was not disciplinary in nature. It simply was intended to permit her time to complete the classes she was required to take as part of the corrective action. In short, Defendant appears to suggest that the removal from charge duty must be considered as a separate event, unrelated to the verbal warning. Because the duration of Plaintiff's ineligibility for charge duty corresponded precisely with the time the verbal warning remained in her personnel file, Plaintiff has sufficiently shown, at the prima facie stage, an adverse action associated with the verbal warning.

The same cannot be said for Plaintiff's 2009 evaluation, prepared in February 2010, as Plaintiff has not made even a minimal showing of an adverse action related

thereto.

    2.  <u>Defendant's Legitimate, Nondiscriminatory Reasons</u>

Defendant maintains that, to the extent it is determined Plaintiff has established a prima facie case, it had legitimate and nondiscriminatory reasons for its actions.

    *a.  The Distribution of Charge Hours*

The CBA applicable to Defendant's RNs provides that charge duty will be rotated evenly among qualified nurses, taking into account continuity of patient care and consistency of assigning consecutive days of charge. Ms. Carlson attests that, as a practical matter, a number of factors dictate how often individual assignments are made. Because many nurses work two or three days on, then one or two days off, their availability varies depending on how their schedule falls in a particular month. Nurses working consecutive days will typically remain on charge duty to enhance continuity of care. Nurses who work two non-consecutive days in a week typically are assigned charge on only one of those days. RNs typically are not assigned charge on the day they return from a vacation or extended absence. Nurses are not assigned charge duty on days they already are receiving additional pay for preceptor duties. Some nurses prefer not to receive charge assignments unless circumstances—such as no other qualified RN working on the shift—requires it. In short, Defendant maintains there necessarily will be variation in the amount of charge duty individuals receive, particularly over the short-term.

Defendant also offers evidence of charge assignments made during the period December 2008 through April 2012, the accuracy of which is undisputed. (Docket No. 27-1 ¶¶ 45-47.)   Over that time period, Ms. Carlson and Ms. Koginos assigned a total of 55 full- and part-time RNs to charge duty on Plaintiff's unit. Of those 55, Plaintiff had the

eighth highest number of charge hours and sixth most charge shifts. She maintained that ranking despite having been ineligible for charge assignments for seven months. Four of the ten nurses with the greatest number of charge hours, including Plaintiff, were African American.

The Court finds Defendant has articulated nondiscriminatory reasons for the existence of some variation in individual charge assignments and also offered evidence that, in general, Caucasians were not favored over African Americans for charge duty.

*b. The Verbal Warning and Removal from Charge Eligibility*

Defendant maintains that it issued Plaintiff a verbal warning not because of her race, but because she violated Defendant's standards. Further, she was removed from charge assignments for a period of time because the violation related directly to her performance of charge duties. Defendant has offered testimony and evidence supporting these nondiscriminatory reasons, and so the burden shifts back to Plaintiff to demonstrate pretext. See Goins v. Bridgeport Hosp., No. 11-CV-560, 2013 U.S. Dist. LEXIS 41160, at *17, 13 WL 1193227, at *6 (D. Conn. Mar. 25, 2013) (plaintiff's failure to follow hospital protocol and difficulty communicating with coworkers were legitimate nondiscriminatory reasons for plaintiff's disciplinary warnings, poor review and ultimate termination); Mark v. Brookdale Univ. Hosp. & Med. Ctr., No. 04-CV-2497, 2005 U.S. Dist. LEXIS 12584, at *74, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (hospital that received five physician complaints about plaintiff's performance had proffered nondiscriminatory reason for imposing two periods of suspension).

3. Plaintiff's Ultimate Burden

Plaintiff contends that, because she is African American, she was assigned fewer

16

charge hours than comparable white nurses and disciplined for conduct that did not lead to discipline if done by a white nurse. But evidence that an individual was treated differently from other employees, standing alone, is not sufficient to prove discrimination. Garzon v. Jofaz Transp., Inc., No. 11-CV-5599, 2013 U.S. Dist. LEXIS 28605, at *8, 2013 WL 783088, at *3 (E.D.N.Y. Feb. 28, 2013) (citing Grillo v. New York City Transit Auth., 291 F.3d 231, 235 (2d Cir.2002)). "It is axiomatic that mistreatment at work ... is actionable under Title VII only when it occurs because of an employee's ... protected characteristic." Patane v. Clark, 508 F.3d 106, 112 (2d Cir.2007) (omission in original) (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir.2001)). Thus, there must be at least some circumstantial proof which, if believed, would permit a finding of discriminatory animus. Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1224 (2d Cir. 1994); see also, Dister v. Continental Group, Inc., 859 F.2d 1108 (2d Cir. 1988) (even where a prima facie case is established, conclusory assertions of discrimination are insufficient to create an issue of material fact as to pretext).

Plaintiff argues that discriminatory intent can be drawn from the additional facts that Ms. Carlson appointed a Caucasian RN to a permanent charge nurse position in 2006, and that Caucasian RNs who committed "dangerous, and even deadly mistakes" were not removed from charge eligibility as she was. (Docket No. 34 at 12.)

Viewing all of the facts presented, and drawing all inferences in Plaintiff's favor, the Court finds that no reasonable jury could infer Defendant's decisionmaking was motivated, in whole or in part, by Plaintiff's race. The undisputed facts of the 2006 charge nurse assignment are as follows:

During that timeframe, Ms. Carlson received several requests and

17

comments from practitioners who worked on the unit about their desire to have a regular charge nurse (as opposed to a rotating charge nurse) as it would provide continuity for rounds and other management/flow functions. Per these requests, Ms. Carlson appointed Ms. Rung as the regular charge nurse (meaning she took charge when she worked) on a trial basis. The trial lasted only one month, as other employees on the unit, including employees of all races, indicated that they also wanted the ability to take charge.

(Docket No. 27-1 ¶88.) "[A]fter the trial ended, charge was distributed evenly." (Id. ¶89.)

As noted, the fact that two white coworkers were assigned more charge hours/shifts than Plaintiff over a four month time period in late 2008 and early 2009 is not sufficient, in and of itself, to infer an intent to discriminate against her based on race. Moreover, her conclusory allegations that she was discriminated against during that time are undermined in three important respects. First, Plaintiff acknowledges that during that same time period, she was assigned more charge hours than Ms. Weinreber, another Caucasian RN on her shift. (Docket No. 32-3 at 63.) Second, after Plaintiff complained that charge assignments were not equally distributed among all interested RNs, Ms. Carlson equalized assignments, one result of which was a reduction in Plaintiff's charge hours. Finally, over the long-term, Plaintiff's charge shifts/hours were among the highest of the 55 charge-eligible RNs, including white, black, and Asian, who reported to Ms. Carlson. In light of these undisputed facts, no reasonable juror could conclude that Plaintiff was intentionally discriminated against with regard to charge assignments.

Plaintiff contends an inference of discrimination arises from the fact that she is the only RN to have been removed from charge eligibility even though Caucasian employees committed the same or more serious misconduct than she. Where disparities in

discipline[4] are alleged, an employee is considered "similarly situated" to co-employees who were (1) subject to the same performance evaluation and discipline standards, and (2) engaged in comparable conduct. Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010) (quoting Graham, 230 F.3d at 40).[5] "'[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.'" Id.

According to Plaintiff, she is similarly situated to employees who "reported to Ms. Carlson and … are RNs." (Docket No. 34 at 9.) With regard to her removal from charge eligibility, only the RNs who were qualified to take charge would be similarly situated. Of the three individuals Plaintiff identifies for comparison, only two are RNs and only one, RN McKinstry, was charge eligible. Plaintiff offers evidence that, in early 2009, RN McKinstry made an error in patient care that prompted an investigation. A note relative to the investigation was placed in his personnel file. There is no evidence to suggest McKinstry was serving as charge nurse at the time of the incident and charge nurses on Plaintiff's shift typically did not take patients.

Defendant maintains the circumstances of RN McKinstry's error are not comparable to the conduct for which Plaintiff was removed from charge eligibility—i.e., participating in a disruptive verbal altercation with a coworker while acting as charge nurse. As a leader in the charge nurse role, Plaintiff was expected to diffuse

---

4 It is Defendant's position that removal from charge eligibility was not a disciplinary measure. That dispute need not be addressed for purpose of this analysis.

5 While the determination of "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury," Graham, 230 F.3d at 39, "[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 568 (2d Cir. 2000), superseded by statute on other grounds as stated by Jones v. N.Y. State Metro D.D.S.O., 543 F. App'x 20 (2d Cir. 2013)).

disagreements, but instead permitted the altercation to continue. Defendant's stated reason for the temporary removal from charge eligibility is that Plaintiff's misconduct related directly to her charge nurse duties, as opposed to her patient care duties. Plaintiff's conclusory statement that RN McKinstry "has a history of mistakes that directly reflect on his ability to perform in the charge role" (Docket No. 32 ¶329) is not sufficient to rebut the legitimate, nondiscriminatory reason articulated by Defendant.

For the reasons stated, Defendant's motion to dismiss Plaintiff's claims of race discrimination in violation of Title VII are granted.

### D.  Title VII Retaliation Claims

The three-part burden shifting analysis applicable to discrimination claims also applies to claims of retaliation. To establish prima facie retaliation, an employee must show: (1) she was engaged in a protected activity, (2) her employer was aware of her participation in the activity, (3) her employer took an adverse employment action against her, and (4) there is a causal connection between the protected activity and the adverse action—that is, a retaliatory motive played a part in the action. Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d. Cir. 2013). The allocation of burdens of proof in retaliation claims parallels that of discrimination claims. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citations omitted).

For purposes of a retaliation claim, an adverse action need not be an action that affects the terms and conditions of employment, such as a hiring, firing, change in benefits, reassignment or reduction in pay. Burlington N. & Santa Fe Ry. Co. v. White, 584 U.S. 53, 64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse,

which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (internal quotation marks omitted). This standard "speak[s] of material adversity because . . . it is important to separate significant from trivial harms. Title VII . . . does not set forth 'a general civility code for the American workplace.'" Id. at 68 (emphasis in original) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)).

### 1. The Prima Facie Case

#### a. Alleged Adverse Actions

Defendant first argues that Plaintiff cannot establish a prima facie retaliation case, just as she could not meet that burden with regard to her discrimination claims, because none of the allegedly retaliatory conduct was materially adverse. Of course, the Court has now found Plaintiff met her prima facie burden with regard to some of the discriminatory conduct she alleged, including removal from charge duties. Moreover, as already noted, "the standard for an 'adverse employment action' in a retaliation claim … is not as demanding as it is in a discrimination claim." Quadir v. New York State DOL, No. 13-CV-3327, 2014 U.S. Dist. LEXIS 115387, at *24 (S.D.N.Y. Aug. 19, 2014).

Plaintiff has come forward with citations supporting the propositions that negative performance reviews and disciplinary actions may constitute adverse actions for purposes of a retaliation claim. See Siddiqi v. New York City Health & Hosps. Corp., 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) (unlike in discrimination claims, negative performance reviews, standing alone, can be considered adverse action in retaliation for engaging in protected activity); Taylor v. New York City Dep't of Educ., No. 11-CV-3582,

21

2012 U.S. Dist. LEXIS 170917, at *30, 2012 WL 5989874, at *10 (E.D.N.Y. Nov. 30, 2012) (same); Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 569 (2d Cir. 2011) (factfinding sessions that were merely a prelude to determining whether corrective action should be taken were not, in and of themselves, materially adverse for purposes of retaliation); see also, Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006) (discipline, suspension, being written up, or issued an unsatisfactory evaluation are traditional indices of adverse employment action amounting to retaliation). As such, Plaintiff is largely successful in meeting her minimal burden.

Nevertheless, even under this lenient standard there are two incidents that do not rise to the level of retaliatory adverse actions. First is Ms. Carlson's inquiry as to whether marijuana found in the workplace belonged to Plaintiff. There is no basis from which a jury could conclude that routine inquiries relating to the maintenance of workplace safety, order, and standards of conduct would dissuade a reasonable person from complaining of discrimination. Next is Plaintiff's 2010 evaluation. Plaintiff's 2009 and 2010 evaluations were both prepared by Ms. Carlson. As the 2010 evaluation is more favorable than the prior year, expressly noting improvement in areas where Carlson previously had documented concerns, there are no set of circumstances under which the evaluation can be deemed retaliatory.

### b. Causation

Defendant next contends Plaintiff cannot show the presence of a causal connection between her protected activity and the alleged adverse actions. At the prima facie stage, a plaintiff can demonstrate causation indirectly, through temporal proximity. Kwan v. Andalex Grp., LLC, 737 F.3d 834, 845 (2d Cir. 2013). The Supreme Court has

noted, however, that to be sufficient evidence of causality to support a prima facie case, the temporal proximity must be "very close." Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (citations omitted). The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," and so courts must exercise "judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (citation omitted). On more than one occasion, however, the Circuit Court has found alleged adverse actions taken within a few months of a plaintiff's discrimination complaint sufficient to establish causation at the prima facie stage. Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998); see also, Ruhling v. Tribune Co., No. 04-CV-2430, 2007 U.S. Dist. LEXIS 116, 2007 WL 28283, at *23 (E.D.N.Y. Jan.3, 2007) (noting that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line") .

The bulk of the alleged adverse actions remaining here occurred approximately two months after Plaintiff complained of discrimination: she was given a verbal warning and removed from charge duty on June 25, 2009, after her complaint to Mr. Tubbins, and she was given a written warning and a negative review in February 2010, approximately two months after filing her EEOC charge. The Court finds this proximity sufficiently close to satisfy Plaintiff's initial burden.

What remains is Plaintiff's claim that her removal from charge eligibility in November 2010 was retaliatory. This event occurred nearly one year after Plaintiff filed

her EEOC charge, and 10 months after any prior alleged act of retaliation. Moreover, unlike all other alleged discriminatory and retaliatory acts, the decision to remove Plaintiff from charge duties in 2010 was not made by Ms. Carlson. In light of these circumstances and the significant gap in time, Plaintiff fails to establish prima facie causation in this regard. See Vecchione v. Dep't of Educ., No. 10-CV-6750, 2014 U.S. Dist. LEXIS 69708, at *12-13, 2014 WL 2116146, at *5 (S.D.N.Y. May 16, 2014) (gap in time of more than six months not sufficient to establish causal link).

      2.  Defendant's Legitimate, Nonretaliatory Reasons

Defendant's stated reasons for issuing a verbal warning to Plaintiff and Ms. Pattacciato, and for removing Plaintiff from charge eligibility for five months, are detailed above and require no further discussion.

With regard to the written warning Plaintiff received on February 16, 2010, Defendant has offered testimony and evidence that, over a one-week period in early 2010, it received three complaints about Plaintiff, each of which involved a violation of one of Defendant's written policies or standards. One involved a lapse in patient care, another a violation of patient confidentiality, and the third an employee's complaint of harassment by Plaintiff. Violation of an employer policy is a legitimate cause for imposing discipline. See Ibraheem v. Wackenhut Servs., No. 09-CV-5335, 2014 U.S. Dist. LEXIS 64474, at *29 (E.D.N.Y. May 9, 2014) (citing Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir. 1997)).

Defendant provides testimony and evidence that, in the year preceding her 2009 assessment of Plaintiff, Plaintiff had participated in a verbal altercation with a coworker that was disruptive to staff and patients. In addition, Ms. Carlson had received a number

of complaints regarding Plaintiff's poor communication skills from her coworkers and from patients. These incidents led Ms. Carlson to rate Plaintiff's performance with respect to service excellence and teamwork/communications as "needs improvement" and to further noted that Plaintiff needed to build team relationships and engage in more effective communication with her peers. Defendant has offered sufficient legitimate, nonretaliatory reasons for the comments included on Plaintiff's 2009 assessment.

      3.  <u>Plaintiff's Ultimate Burden</u>

The Supreme Court recently held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." <u>Kwan</u>, 737 F.3d at 846.

      *a.  The June 25, 2009 Events*

Plaintiff does not argue that retaliation was the but-for cause for her verbal warning. Indeed, it is beyond dispute that Ms. Pattacciato received the same corrective action as Plaintiff as a result of their altercation.

Plaintiff does, however, contend that the removal of an employee from charge is not an established workplace practice, and the conduct that prompted her removal—a workplace argument—is a common occurrence on her unit for which others were not disciplined. The Court finds that neither premise is a sufficient basis from which a jury could reasonably infer but-for causation.

25

First, Plaintiff's assertion that employees on her unit regularly engaged in verbal altercations is entirely unsupported. Plaintiff has not identified any participants or a single instance in which such conduct occurred.

Defendant states that its concerns relating to Plaintiff's assignment to charge arose from her failure to diffuse the situation while acting in a leadership role. Plaintiff's coworkers confirmed that after walking away from the altercation, Plaintiff felt the need to return and continue the dispute with Ms. Pattacciato. Plaintiff has not identified any situation in which an employee engaged in unacceptable conduct with regard to his or her charge duties, but went unpunished. In contrast, Defendant has identified another of its employees—an imaging technologist—who was removed from his leadership role after several employees complained about his style and poor communication skills. That employee, who is Caucasian, was removed from his lead role for a full year.

In light of these circumstances, there is not a sufficient basis from which a jury could reasonably infer that retaliation was a but-for cause of Plaintiff's temporary removal from charge duty.

          *b.  The February 2010 Events*

Plaintiff's asserts that she did not engage in any of the conduct about which Defendant received complaints and for which she received her written warning. Such conclusory statements are not sufficient to raise a question as to but-for causation.

Plaintiff next contends that two coworkers, LPN O'Laughlin and RN McKinstry, committed errors with regard to patient care, just as she is alleged to have done, but they were not disciplined. The record reveals that Ms. O'Laughlin performed a task that was outside her job description, she self-reported her conduct, and was issued a verbal

26

warning. The record also shows that RN McKinstry committed an error which contributed to a fluid overload in a patient, for which he received a verbal counseling, a note in his file, and reeducation. In light of the record, which includes evidence that Plaintiff's discipline was based on multiple violations over a brief time period, her evidence is insufficient to infer that she would not have been disciplined but-for having filed her EEOC charge.

Finally, in light of the foregoing, there is no basis from which a jury could reasonably infer that, but-for a retaliatory motive, Plaintiff's 2009 evaluation would not have included comments about her need to improve team relationships and communicate more effectively.

Thus, summary judgment is warranted with respect to Plaintiff's retaliation claims.

### E. HRL Claims

"Discrimination and retaliation 'claims under the HRL are evaluated using the same analytical framework used in Title VII actions.'" <u>Serrano v. N.Y. State Dep't of Envtl. Conservation</u>, 12-CV-1592, 2013 U.S. Dist. LEXIS 178939, at *28, 2013 WL 6816787, at *10 (N.D.N.Y. Dec. 20, 2013) (quoting <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 169 (2d Cir. 2012)). Because Plaintiff's Title VII claims are dismissed in their entirety, the HRL claims must be dismissed, as well.

### IV. CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment is granted and this case will be dismissed.

### IV. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 27) is GRANTED.

FURTHER that the Clerk of Court shall take the steps necessary to close this case.


SO ORDERED.

Dated:   September 29, 2014
         Buffalo, New York

                                        /s/William   M. Skretny
                                         WILLIAM M. SKRETNY
                                            Chief Judge
                                      United States District Court